Annette Adolski v. Premier Directional Drln Good morning. May it please the Court. Annette Adolski on behalf of Premier Directional Drln. This case should be reversed and rendered in favor of Premier based on the overwhelming record evidence that these highly skilled and highly paid directional drillers were a guide. And the key question here is, as a matter of economic reality, are these directional drillers in business for themselves? This is an important FLSA case to this industry who relies on independent contractors and also to the amici who are concerned about the viability of their small businesses. This case is similar to Carroll v. Sunland Construction and Herman Express 60 Minutes Delivery, which Judge Barksdale and Judge Smith considered. But it's most similar to Gate Guard Services v. Perez, where this Court awarded over a million dollars in attorney's fees because Judge Jones said during oral argument at minute 11 that it was so obvious to the casual observer that the gate attendants were contractors that the DOL should have never pursued that case. And the facts here are even stronger. What is the record evidence? First, Premier did not control these contractors. Just like in Herman and Gate Guard, they had the freedom to turn down work. And there's been a lot of back and forth in the briefing about this without repercussion. Mr. Parrish testified that he turned down work. Record 3201-3202. Mr. Alfaro said he didn't turn down work, but he knew of others that did, and there was no repercussion. They still got called back for other jobs. Employees of Premier couldn't do this who were directional drillers. And in Herman, Carroll, and Gate Guard, just like it is here, they didn't have non-competes. They could go work for anybody they wanted to. The fact that they just wanted to work for Premier, it's a free country. They can do that. What did Premier do to tell them they couldn't work for other companies? Nothing. And the district court simply didn't consider or didn't just bypass this very significant evidence. The district court did acknowledge that these directional drillers who are getting paid up to $300,000 a year had no day-to-day supervision, so we can all agree on that. They were so skilled, talk about economic reality, that they could command up to $1,400 a day and make $300,000 a year on the open market. And they did that. They opened up their stand-alone businesses. They took all of these write-offs on their tax returns for travel, for meals, for vehicles, for repair, for office space, and they paid a fraction in taxes as a result. And one of them, Mr. Ellistead, paid zero in taxes, yet they are seeking overtime, making $300,000 a year. Can I ask about the tax write-offs? I want to clarify about the tax write-offs. Sure, Your Honor. I apologize, I wasn't clear on what I read. Were they just deductions for businesses, or did some of the plaintiffs suffer losses? One of the plaintiffs suffered a loss, and that's a very good question. I'm glad you asked that. In other words, your opportunity for loss, there was actual loss by at least one of these plaintiffs? Yes, with respect to Mr. Ellistead, who was a very sophisticated businessman. He had a goat farm, and he deducted every dollar he spent on that goat farm from the income he earned from Premier, and he paid zero in taxes. And this was exactly like T-Vault. I'm sorry, he suffered loss from this business, or from a goat farm? From the goat farm. Okay, so you don't have any But this was similar to what this Court considered in T-Vault, that Mr. T-Vault had realized tax advantages from drag racing and his picnic table businesses that he deducted from his splicing work that he did for Bell South. So this Court has considered that if you have other businesses, and it's under the umbrella, you're the businessman, you make decisions as to what you're deducting and what you're not deducting on your taxes. In addition, these directional drillers were working project to project with several weeks in between. They weren't guaranteed additional work. The employee directional drillers were guaranteed additional work. The appellees at their depositions testified they were contractors, that they like being contract. Mr. Alfaro, I was a contractor for Premier. This matters. This Court has considered, if it's a truly economic reality and it mirrors economic reality, what they think and what Premier think as to their relationship really matters. And in fact, getting back to the amici, of the 93 contract directional drillers that received notice of this class action, who are all supposed to be similarly situated to Mr. Parrish, 89 of them chose not to participate. Four of them are participating. That's telling. The independent contractors here testified in their depositions they wanted to go in business for themselves because they would make additional money. They had freedom and tax benefits, and that's in the record at 3128, 4347, and 5296. But yet we're here talking about whether or not these highly skilled and highly paid individuals should get overtime. They actually earned more money than the employees did. So they earned $1,300 to $1,400 a day. The employees were earning $750 a day. These appellees paid significantly less in taxes, but yet they're here demanding overtime. It's customary in the oil field industry, and it is important to this industry to be able to use independent contractors. And that's why this case is so important, because what is it saying, that the oil industry can't use independent contractors? And here we're up to, this is a situation that this Court really hasn't considered. You've looked at blue-collar workers. You've looked at delivery drivers and dry cleaners and people that sell fireworks. But this Court has never considered real sophisticated businessmen that can command $300,000 a year and actually have a skill. So Judge Ezra is a very careful judge. I'm sure you'll agree with that. He's very diligent. Obviously, you're challenging his judgment, as you're entitled to. Where, in your view, do you think he went wrong? I think you and I can agree that he studied, would have studied this very carefully and conscientiously, but what was the flaw in his reasoning, in your view? How did this happen, in other words? Yes, I think he made a mistake. This is a very large record, and if you don't go back and review the record very specifically and sometimes rely on briefing, you can get confused. And he also, he analyzed these factors too technically. We have to look at the big picture here. Are these gentlemen in business for themselves? So let me talk about some of the mistakes he made. He said what weighed most in his analysis, what weighed most heavily, was that there were no appreciable differences between the employees and the directional drillers and the independent contractor directional drillers. And as I just articulated, there were significant differences. Here's what he did. So with respect to the skill factor, which he found neutral, he said that the contractors are not more skilled than the employees. We all agree. Unfortunately, that is not the standard. Comparing job duties between employees, as you know from Herman versus 60 Minute Express or Express 60 Minutes Delivery, comparing job duties is contrary to Silk, Herman, and Talbert. It's the wrong analysis. The question is not whether you're the same as the employee you're working next to, but do you have a portable skill set that you can go sell on the open market? Guess what? Mr. Alfaro, who claims he was switched and swapped a contractor, actions speak louder than words. You know what he did? He went out and opened up his own business. He ousted his renters when he became contract, opened up an independent office space, took all of the deductions, and then left Premier and went to MS Energy and did contract work for them. There's no such thing as a switched or swapped. But that was pounded upon in the briefing, in the argument, and I think Judge Ezra just, he got confused. He was looking at these technical aspects. He used the wrong analysis. I mean, look, he's comparing this case to Brock. In that case, you have unskilled workers. They can't take a fireworks business and go sell fireworks somewhere else. But these directional drillers, this is so complicated. They're charging $1,400 a day to, if you're in Houston and you're at the top of the Bank of America building, you have to steer a consult, you don't do the drilling, on steering that drill to a door in Minute Maid Park. Yes, there's a well plan, but the well plan doesn't tell you how to do that. So you have to understand the job, you have to understand the business, and you have to look at the context of the cases. The Fifth Circuit has looked at really low-wage, blue-collar workers, and they found that some of them were contractors. What about the out-of-pocket expenses, the investments? Talk to us about that. Sure. The tax return, the proof is in the pudding with respect to the tax returns. The tax returns show us all of the expenses that these individuals took. So Alfaro was the only one that opened a stand-alone office. All of them had business names, J.D. Alstad, Parrish Consulting. This is like six figures or five figures a year that they're spending on average $120,000 a year in expenses and deducting all of those from their tax returns. So vehicles, repair for vehicles, they have to travel to these sites, so they wrote their vehicles off, they wrote the repair, they wrote off lodging, they stayed in hotels sometimes, sometimes they stayed on site. Their food, their calipers, and here's where the court also went wrong, which it would be great to have some guidance from the Fifth Circuit, in some cases, that there's this dispute about should you compare the investments overall? In other words, should we look at Target and say, okay, how much does Target spend on all of its land and companies versus a window washer that's a contractor? Big companies would never be able to hire contractors if we compare the overall investments of the company and the worker. So what the Fifth Circuit and other courts started to do is say, okay, well, let's compare just the job. So if we look just at the job at issue, like in Brock, how much is, let's compare how much the company and the employee is spending. But here that's hard to do, and that's another place that Judge Ezra, I think, went wrong, because he said, okay, Premier has a massive investment, they're buying the $800,000, a tennis umpire at the U.S. Open, do we look at how much they're paying the tennis players and the courts and the nets? He's there, he's got it in his head. So he really doesn't need anything to do the job. Your point is the plaintiffs are spending hundreds of thousands of dollars a year. If they have a bad year, Premier doesn't use them, they're out that money. They're out the money. Let's say they spend, you said, $100,000 a year, and if Premier doesn't hire them, they're out the money. That's correct. They take a huge loss. That's a loss. You mentioned that there are parallel actual employees. Yes. How much are they spending? They are, first of all, they're getting reimbursed for their expenses, whereas the contractors are not getting reimbursed. They're like most employees, they're not spending anything. They're getting the computers, they're getting the software. You know, Premier supplies a said, I used my own computer and had my own software. Some of the plaintiffs, just to be really technically correct, said they used Premier's computer because it was on the rig. They didn't always use their own computer. They used Premier's software. So at the most, let's just give that to Premier. They provide the software, they provide the computer. That's it. You can't stick Premier with mud motors and all this equipment at the rig because these directional drillers, they're consultants. They don't need that. They don't get dirty. They're not getting down there and dealing with, it's the driller. They stand behind the driller and tell the driller what to do. These are highly sophisticated guys on site. So you have to have an understanding of the job. The facts are really important in this case. What if any evidence was presented as to expenses paid by employees who are not employees of Premier for work-related items? The only thing in the record that I'm aware of is mileage. They got mileage reimbursed, and actually so did the contractors. Contractors did get their mileage reimbursed from Premier. But I'm not aware of any expenses that any employee incurred, and they certainly weren't writing them off on their tax returns. So for Judge Ezra, and I agree he's a careful judge and have the utmost respect for him, this was not an easy case. He just, look, I disagree. There are appreciable differences in the way these guys were treated. They weren't supervised, so of course nobody was supervised out there. They had these directional driller coordinators. Of course they got to tell them where to go, and here's a job packet. You got to know what you're doing, and here's the well plan. But they're not. The testimony from Mr. Parrish is he saw them very occasionally. They weren't out there. But I see my time is coming to a close, and I need to address one issue, and that is with respect to willfulness. There was a glaring air bite by Judge Ezra, and again, not his fault, because I think it slipped by him. The Pelley's did not move for willful, on the willful claim. It's their burden of proof. They have to show that Premier recklessly and or knowingly misclassified these workers in order to extend the statute from two to three years. You're saying it's waived? Yes. They didn't move on summary judgment. But they are accused, they have argued that Premier waived it because Premier didn't raise a statute of limitations defense. Well, yes, we did in the answer, but at summary judgment, you've got to move for it. There's nothing in the brief that says anything about willful, nothing in the brief that says anything about three years. All right. Your initial time has expired, Ms. Johnson. Thank you, Your Honor. Thank you, Mr. Post. May it please the Court, Russell Post on behalf of the Appellees. This case is not a referendum on the use of independent contractors as directional drillers, as Premier would have you believe. It is a fact-bound determination in which Judge Ezra carefully made a determination about the record as it applies to these five appellees. And a narrow affirmance based on the facts that apply to these individuals who opted into this collective action and no other directional drillers is the appropriate disposition and the right way to deal with the evidence in the record. Well, let's just take care of it very quickly of the claim that the judge erred in awarding three years damages, which requires willfulness and the point that you did not specifically request it in the summary judgment proceeding. Your Honor, I think that we can agree on the state of the record. The motion for summary judgment sought three years of damages, set forth the claim for three years of damages, did not explicitly move for summary judgment on willfulness. And if the Court holds it was our obligation to move on willfulness, I acknowledge we did not. And Judge Parrish, I'm sorry, Judge Ezra didn't even address willfulness or anything else, any basis in his order for why he was giving three years. He did not, Your Honor, and I submit that the reason for that is that the summary judgment motion requested an award of damages, set forth the damage calculation, and Premier did not object that there was a failure to establish willfulness. As I understand it, all you presented was a mathematical figure. Did you explicitly in your summary judgment motion say we are entitled to three years? Your Honor, I can't recall whether we explicitly said in the motion we are entitled to three years. I will certainly concede, though, we did not affirmatively make any argument regarding willfulness. All right. And so I think the answer here is where the burden falls. If that was our burden, then I concede that we don't carry it. If they have the burden to object, then I think they have to concede they did not object. Turning to the analysis of the facts of this case, I want to focus on the various factors that counsel has identified. I will not take them necessarily in the same order that she addressed them, but, of course, the Court can take me in any order it wishes. But I want to begin with the assertion made by counsel that there is no authority in this circuit for Judge Ezra's determination that there are no appreciable differences between these directional driller classified contractors and employees. That is not correct. The Court held in Donovan v. Takeo that evidence that an individual who had been a contractor and was now an employee was doing basically the same job was evidence that supported the employee classification for the entire period. Likewise, in the Usery case, this Court recognized the fact that there was no distinction between the work done by the employee-classified workers and contractor-classified workers was a basis to hold that the workers were, as a matter of economic reality, employees. So I think that circuit precedent gave Judge Ezra solid grounds to reach the conclusion that he did. And I provided the Court a bench exhibit this morning. I want to make sure that I can provide in context an explanation of some of the evidence that we've been discussing. When you turn to tab 1 of this exhibit, these are the termination forms for the two former employees who the record supports were swapped from employee to contractor. And I want to point out that the first document is for Mr. Alfaro. Is this the same Mr. Alfaro that opposing counsel spoke about? It is, Your Honor. And Mr. Alfaro, after he was unilaterally swapped over his resistance to contractor status, was then in a position that he had to set himself up as a contractor to continue doing the same work that he had done previously. So it's not as if he made a voluntary decision to opt into that status. The same document appears with respect to Mr. Robbins. Just to use an analogy, though, there are companies that have in-house counsel and outside counsel. Some small companies will toggle back and forth, and it's the same kind of work. I assume you don't submit that the lawyers can't be independent contractors. Absolutely. I completely agree, Your Honor. Now, of course, lawyers are a special class since they're exempted, but putting that aside. No, I get that, that professional exemption, but just conceptually, I think you wouldn't support it. Conceptually, I agree. And I would make the point that it's the economic reality of the working relationships. And a law firm, if we put aside the professional exemption, could not treat the workers, lawyers, identically if they were employees and contractors, except for the way in which they were compensated, and then defend the classification. There has to be a meaningful economic difference. And there's not here. And so let me turn specifically to what A company can't insource or outsource and toggle back and forth with the exact same legal work? It can, Your Honor, but there have to be meaningful economic differences between the two. That's my only point. And so that's what I wanted to drill down on here, is there are many ways to look at these silk factors. But I would submit one sort of ultimate inquiry is, does the individual have entrepreneurial freedom and initiative to create profit, to take risk, et cetera? So opposing counsel submitted that these plaintiffs undertake roughly six figures in out-of-pocket expenses per year. Do you dispute that? Your Honor, I don't dispute the numbers reflected in the tax returns, but there are two important caveats. Number one, in many respects, those tax returns do not attribute expenses to any particular activity, not to directional drilling, certainly not to work on behalf of Premier. So I think counsel is drawing some ambitious inferences. But second, and I think more important conceptually, that argument begs the question, because when Premier says, we will compensate you as contractor, formal, and not formally as employees, they change their labor costs. They change the structure of the labor capital investment. And they do pay more to the contractors than they pay to employees, but then they shift expenses. The economic reality, though, is no different. But isn't the shifting around precisely changing the economic reality? No. No, Your Honor. I'm not sure. You need a full-time lawyer, so you're going to shift it out. Not with respect to the FLSA, because the question is, are the individuals Have you ever heard of an employee who spends that much money out-of-pocket and puts that much personal money at risk? I'm sorry, Your Honor? You may have an example, but to me, I've never heard of an employee who spends that much money out-of-pocket and puts that much personal capital at risk. But let me know if there are different, if there are examples of that. I don't have a personal example of that. Or in the case law. But I would submit that's a smoking gun that to us reflects, these are really business expenses incurred by the employer in the ordinary circumstance. So what you're pointing out to me is, an employee doesn't typically incur these expenses. I agree. But the economic reality here is that all this income was coming from Premier to these individuals. And by the way, I want to speak to the suggestion that there was competition. There is no evidence in this record that any of these five individuals worked for any competitor of Premier at any time during their relationship with Premier. So all of the expenses are actually being covered by the compensation that Premier is paying. And Premier is just shifting the tax reporting obligation over to the contractors. But the economic reality is the same. And in fact, counsel suggests that in some way the industry is looking to what happens in this case because the industry is concerned about this. I would submit the most common manner of employing directional drillers in this industry, as Premier itself does, is to treat them as employees and to treat them as exempt employees. And Premier could have classified these five gentlemen as salaried employees, paying them a salary and treated them as exempt and had no liability under the FLSA. Premier made a choice for its own labor cost reasons to classify them with no economic substance. And if I may, just because scale that's applied. So when we talk about swapping, this is what we're talking about changing from. And you see it's an experience based compensation scale. There are tiers for the employees and there are tiers for the contract classified individuals. But there's the same experience classifications for both. An employee has a different compensation structure in that they receive a salary per month and then a day rate per job. The contractors receive no salary, a larger day rate. The business expenses are shifted to the contractor's reporting. But the economic substance is the same. And in the reality, for these five individuals, perhaps not for others who are not parties to this case, but for these five individuals, they were simply paid according to this compensation scale. Premier made the decision what it would pay. There was no negotiation. There was no contract bidding. There was no situation where any of these individuals bid for jobs. They did not negotiate over their pay. Pardon my... Yes, of course, Your Honor. If I could interrupt. I thought there was a reference in the district court opinion to the rates varying from 425 per day to 1,500. Can you explain that? That is correct, Your Honor. To the extent that the rates varied for these individuals, they varied based on what Premier chose to pay these individuals according to their scale. There is also argument from Premier that some directional drillers quoted different prices for different jobs. But that's not these plaintiffs. So I want to embrace, Your Honor, the hypothetical you gave me earlier about how law firms might engage lawyers. Not all lawyers are created equal. Some lawyers engaged on those terms might have to take exactly the terms that the law firm offers because they don't have the market power to negotiate a different term. Others may be able to bargain for a specific task and a specific engagement. And the reality economically for these five individuals is that they did not negotiate over pay. They were simply assigned to this compensation scale. Let's go back to tab one just a minute. Yes, Your Honor. In conjunction with tab three. So just explain to me, for Mr. Alfaro, the explanation says swapping to contract pay. And then for the second one, Mr. Robbins, it says move employee to contract. I assume those two are equivalent. They're worried slightly differently. So explain to me your understanding of, and I understand these were Premier's exhibits, but what's the meaning of that as it affected these employees? The economic meaning, and I agree, I don't want to get caught up in the semantics of the language, but the economic meaning is that Premier made a determination that it would transfer these individuals from an employee status being paid under tab three on the compensation scale as employees to contract status being paid on a contract basis. But nothing else changed. And in tab four, and I won't burden the Court with walking through the details, but in tab four we have the testimony from one of the Premier coordinators that acknowledges there is no difference in job duties. There is no difference in job skills. You don't see a change in sort of a shifting of economic risk, shifting of cost, shifting of risk in the event that demand changes? Your Honor, there certainly is a change in compensation. I don't think there's a change in risk because these individuals were repeatedly undertaking assignments for Premier. And so the reality of their relationship for the period within which they were working for Premier, and of course at some point for each of them that work concluded, but at the period in which they were working for Premier, the reality is they were continuing to receive assignments and they had very brief windows of time between job assignments. If you're an employee, you rely on a regular wage. You don't have out-of-pocket expenses, at least not six-figure ones. If there is, you know, a lag in work for weather or for whatever reason, you continue to get paid. Whereas if you're off on your own, you take the expense. If the industry changes, you take the loss. Isn't that a pretty substantial difference? It would be, Your Honor, if the economic reality were that these individuals were not uniformly working for Premier and dependent on Premier to continue to provide the work. Why does it matter that they have one client or 12 clients? What matters, Your Honor, and I think this matters critically, because in the cases that this Court has held, in close cases, the workers were contractors and non-employees. The cases to which counsel alludes, Carroll, Thiebaud, in each of those cases, there was evidence that the worker accepted work from another enterprise other than the defendant. So they were genuinely independent actors in the marketplace, accepting competing work, substituting work. That is not the case here. There is no evidence of competing work during the period of these claims for these individuals. And there is a hint in the briefing that one of the plaintiffs, Mr. Beckett, accepted competing work during the term of his engagement with Premier. But the record citations do not bear that out. So let's go back to tab one just a minute. Yes, Your Honor. I noticed that only for Mr. Robbins, not Mr. Alfaro, the box is checked that says lack of work. I'm not asking you to speculate. Is there anything in the record that tells us why that box was checked or whether there was anything in regard to Mr. Robbins but not Mr. Alfaro that had to do with lack of work? Your Honor, I don't believe that the record speaks to the difference between the way these two forms were filled out in that respect. I do believe the record suggests, and I'm sure counsel will make this point, that it was a change in economic circumstances that led to less work for directional drillers and a determination for these individuals to move them to contract status. But the point is that their economic relationship to the enterprise then did not change in any respect except the compensation. And so, Judge Ho, you asked me, isn't it a meaningful economic change when you change from employee to contractor status? But that's respectfully begging the question because the whole point of misclassification liability is to determine whether there is, in fact, a legitimate basis for that economic change. If there's no meaningful difference in the economic reality other than the compensation structure, then the FLA, say, penalizes an employer for seeking to create the illusion of a contract relationship when, in fact, there's an employment relationship. I had alluded earlier to what I consider, to some extent, a Rosetta Stone here for whether the workers are actually independent businessmen, whether they're in a position to exercise initiative to earn profits, take losses. This is, I think, one of the most important factors in the case because, as I've said, these workers, as a matter of fact, not as a matter of theoretical possibility, but as a matter of fact, these workers did not bid for potential contracts and were not given the opportunity to bid. They did not negotiate over compensation. They paid what they were assigned by the directional drilling coordinator on that compensation scale. They did not have a right to subcontract the work in order to leverage any expertise. They did not have a right to select their preferred assistance or to select the equipment. This equipment is of great significance. You notice council never talked about the relative investment that Premier makes because these directional drillers cannot do their job without the measurement while drilling assistant and the tool that monitors it. They have no function in this industry without the assistant and that technology. The tool costs $800,000. The assistant is treated as an employee by Premier. Once Premier classified assistants, as well as independent contractors, has reclassified them all as employees. Let me just a minute to the summary judgment methodology. There were a couple of factors that Judge Ezra said were neutral, a degree of control and skill and initiative. I'm wondering how he was in a position on summary judgment to decide those questions. In other words, tell us why there weren't disputed issues of material fact as to those. Your Honor, I've spent a great deal of time thinking about this question because as a lawyer who doesn't practice routinely in the FLSA area, it seemed to be a surprising resolution to me. But I think what Judge Ezra was doing was trying to faithfully follow the course laid out by this precedent. I think there's multiple answers to the court's question. The first answer I would submit is I don't think there are genuinely any disputes about the historical facts. There are some disagreements about the conclusions to be drawn from those facts. But I don't believe Judge Ezra actually resolved any disputed historical facts. What he did then was to say with respect to certain historical facts, some of these facts point both ways on a particular factor. So let me take one illustration that the reply brief points out. The reply brief says Judge Ezra said the directional drillers controlled their schedules and it said Premier controlled their schedules. How can he make that conclusion? That's a conflict in the evidence. But it's not because the control, the directional drillers exercise to which he was referring was the accept job. The evidence is they accepted every job they were ever offered by Premier. This record establishes they never refused any job. But that was the control, the drillers exercise. The control Premier exercised. Does that make sense to you? The fact that a company likes more business? That doesn't mean control. Well, Your Honor, I think that what it signals is Judge Ezra was saying the directional drillers have some control in the sense that theoretically they have autonomy about whether to accept a job or not. And my point as a practical matter is they did in every instance here. So I want the facts to be clear on this, that they never declined work except for, as counsel alluded, two or three instances where Mr. Parrish was physically unavailable. You don't dispute that they could have. I don't dispute that they could have. That's right. And Your Honor, and I know I have a red light, but if I may, I would just point to consistent line of this Court's authorities that what an employee could have done is not legal and material. It's what he did that counted. And what he did in every instance was to accept work. Judge Smith, I haven't quite completed my answer to your question. I'm happy to answer or if you'd like me to sit down. Go ahead and answer it and then I'll give Ms. Ezra a chance to answer it. Okay. Thank you, Your Honor. I think the point I was making was that Judge Ezra didn't resolve any disputes of historical facts. He simply determined that when he looked at all the facts historically as undisputed, there are certain factors that he considered to be neutral or in equipoise, but the ultimate economic reality dictated employee status. The Cromwell decision from this Court, which I acknowledge is a non-precedential decision, but I think illustrates this situation where this Court looked at a situation where several of the facts are in equipoise, but said nonetheless the economic reality supports a determination of employee status as a matter of law. And I think that that's what Judge Ezra did here. All right. Thank you, Mr. Post. I thank the Court. Ms. Adowsky, you say time for rebuttal. Let's give Ms. Adowsky seven minutes. Thank you, Your Honor. I have quite a few things to address here. The two factors, the Court found employee status with two out of five factors. There's not a district court case or a Fifth Circuit case where a court has found employee status with only two out of five factors. That's a — that is a major problem. Well, but we aren't really wedded to, like, arithmetically adding up the factors, are we? No. That's not really the methodology. We look at the entire picture rather than breaking it down factor by factor. Exactly, Your Honor. I agree with that. It's the key question that we're most concerned about, but the truth of the matter is no court has ever done that. So the factors do matter. I want to talk about the error that the judge — we talked about the skill factor that the judge found neutral, and I think I've already established where the error was there from our standpoint. And then I want to talk now about the control factor being neutral, which it really wasn't. The district judge was very clear that he relied on three things in finding that the control factor was neutral. Three things that were argued by the appellees, and one was he said that it was neutral because the contractors had to go under — undergo safety training and drug testing. This — this — at GateGuard, Judge over the details of the work, and that's not what Congress intended by the FLSA, is that we're going to turn someone into an employee simply because we're following the law — OSHA and the law and making a safe work environment. So one of the things he relies on, one of the three, is simply not even part of the analysis. He also found that the nondisclosure agreements showed control by Premier, and in Talbert, the court specifically said confidentiality has nothing to do with employees' work or their freedom to earn a living or anything like that. And as an aside, that nondisclosure agreement was not even with Premier, it was with the staffing company. So the judge erred in considering any reference to the consulting agreement in the order was not even with Premier. So all of that is error. It's just — it's not in the record. And then finally, he said that Premier had control over the work schedules. Well, you know, potential issue of fact, which we don't think there is one, is that they — these contractors had the ability to accept or reject jobs. And the judge says repeatedly in his order, but they feared if they rejected that they wouldn't get other jobs. Well, that's speculation. But if we — if you don't agree with me, then it's at least an issue of fact whether or not they could — whether or not they could reject or accept jobs. The reality is Mr. Parrish testified — it's in the record — that he rejected a handful of jobs. So this chart that you're being shown by my friend, it actually cuts off the last sentence, which says — the question to Premier was list all the jobs that these individuals accepted. It didn't say list all the jobs these individuals rejected. And what you have in front of you as a track of the jobs these individuals rejected? What tab are you referring to? Tab six, Your Honor. He didn't even refer to that in his argument. That's why I'm a little confused. Oh, he didn't? Okay. Well, to the extent — I believe he said that it's in the record that they didn't reject any jobs. And that's just absolutely — it's not true. It's not true in the supplement, and it was in the briefing, and that's true. We have Parrish saying that he did reject jobs and Alfaro saying that, indeed, he heard of others rejecting jobs. So that all goes to control. Those are the only three things the Court looked at when it decided the control factor was neutral. And it disregarded everything else, all of the evidence that Premier put forward in that regard. There is no evidence that, in this industry, directional drillers are employees. That was a statement made by counsel. It's not in the record. It's not in the record anywhere. In Carroll, in Herman, in Talbert, none of these individuals had to bid on jobs. That is not a requirement. This pay scale or the charts that you were talking about, there's one for contractors and there's one for employees. They don't use the same chart, and it's absolutely negotiable. Again, just because these guys decided they wanted to work for Premier and work for one employer doesn't mean that Premier controlled them or somehow discouraged them, like in Brock v. Mr. Fireworks, where they had a contract that said, hey, guys, here's the prices. Make sure — you know, hint, hint — make sure you follow our rules. Premier never said you can't work for anyone else. There's no non-compete agreement. And so, when we look at control, we have to consider those things. And that's what Carroll tells us. That's what Tebalt tells us. That's what Herman told us. Judge Ezra didn't consider any of those things. And so, as a matter of economic reality, we're not shifting taxes. I mean, the issue here with the guarantee, for example, the employee directional drillers were guaranteed pay. They received that salary, whereas the contractors never received a salary. They were never — if they didn't get called for a job, they didn't — they didn't — they didn't earn any money. They didn't work. Mr. Elistad, again, opposing — my friend says that, look, these are just part of the shifting of the expenses. Well, Mr. Elistad paid his wife 50 percent of the company's business. These companies — these individuals — or the plaintiffs testified that they only worked for Premier, and they set up these companies. So what else could these expenses be attributed to? So, at the end, in closing, Your Honors, these highly skilled directional drillers, who are commanding $300,000 a year, had — didn't have non-competes, could reject or take work that they wanted, actually worked as contractors, at least two of them, Alfaro and Mr. Beckett, after they left Premier. And that matters. If you'll look at Carroll, the same thing happened in Carroll. They looked at, did you — did you work as a contractor anywhere else? Doesn't have to be the same time as Premier. They swore to the IRS under oath they were independent contractors, and in doing so, they took advantage of it. They saved tens of thousands of dollars. Mr. Elistad, remember, paid zero. He — Your time now has expired, and your case is under submission, Ms. Elistad. Thank you very much, Your Honor. Last case.